IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                               2:17-cr-02189 RB-1

IZAIYA SILVA,

    Defendant.

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW DENYING DEFENDANT'S MOTIONS TO SUPPRESS**

This matter comes before the Court on Defendant's Motion to Suppress (Doc. 20) and Supplemental Motion to Suppress (Doc. 33). Having reviewed the accompanying briefing, hearing testimony, and documentary evidence and being otherwise fully advised, the Court will deny the Motions.

**I.    Procedural Posture**

The Indictment charges Defendant with: (Count 1) Possession of an Unregistered Firearm - Short Barreled Shotgun, in violation of 26 U.S.C. §§ 5841(a), 5845(a)(2), 5861(d), and 5871. On October 4, 2017, Defendant filed a motion to suppress the fruit of a search of his affects seized at the time of his arrest. (Doc. 20.) The Government filed its response on October 18, 2017, and this Court held a hearing on November 2, 2017. (Docs. 24, 27, 32.) On November 20, 2017, Defendant filed a supplemental motion seeking to suppress recorded statements he made during his initial post-arrest interview on May 11, 2016. (Doc. 33.) The Government filed its response opposing the motion on November 22, and this Court held a hearing on November 30, 2017. (Docs. 40, 41.)

## II. Background

In the Motion to Suppress (Doc. 20), Defendant moves the Court to prohibit the United States from "procee[ding]" in this federal case "for possession of an unlawful firearm," because he contends that the inventory of his personal effects violated the federal Constitution, New Mexico state constitution and New Mexico law. (Doc. 20 at 2–3.) Specifically, Defendant alleges that the supposed inventory search performed by law enforcement was mere pretext for an unlawful investigatory search without probable cause. (*Id.*) In his Supplemental Motion to Suppress, Defendant makes clear that he seeks to exclude the recorded statements made to then-Doña Ana County Sheriff's Office ("DASO") Detective (now Las Cruces Police Department Officer) Pierce Wilber during his initial post-arrest interview on May 11, 2016.[1] (Doc. 33.) The basis of this request for suppression is Defendant's assertion that DASO officers violated his right to counsel under *Miranda v. Arizona*, 384 U.S. 436 (1966). (*See* Docs. 20 at 2–3; 33.)

As to his initial motion to suppress, the Government responds that the motion should be denied because the search performed by law enforcement officers fell within the inventory exception to the warrant requirement and complied with all department inventory protocols. (Doc. 24 at 7–11.) Accordingly, the Government contends that the officer's conduct constituted a legitimate search under the Fourth Amendment and argues that the fruits of that search are admissible as evidence against the Defendant. (*Id.*) With regard to Defendant's supplemental motion, the Government asserts that the motion should be denied because Defendant

---

[1] Defendant initially requested suppression of statements he made to ATF agents during his self-surrender for the execution of DNA search warrant. (Doc. 20 at 2–3.) In response, the Government made clear that it had no plans to introduce any such statements against Defendant. (*See* Doc. 24 at 12.) However, Defendant indicated at the November 3, 2017 hearing and in his supplemental motion that his initial motion contained an error and that he actually sought exclusion of statements made to then-DASO Officer Wilber at the time of his initial arrest. (Doc. 33.) The Government opposes this exclusion. (Doc. 40.)

2

acknowledged that Officer Wilber advised him of his *Miranda* rights and agreed voluntarily to provide statements to Officer Wilber, waiving his Fifth Amendment rights. (Doc. 40 at 1.) The Government further contends that at no time during the interview did Silva revoke his waiver of the right to counsel and to remain silent, meaning that his confession remains admissible. (*Id*. at 1–3.)

### III.  Factual Findings

Rule 12(d) of the Federal Rules of Criminal Procedure provides that when factual issues are involved in deciding a motion, the Court must state its essential findings on the record. *See* Fed. R. Crim. P 12(d). The Court makes the following factual findings based on the evidence in the record and evidence adduced at the hearings. At the November 2 and November 30, 2017 hearings, the Court heard testimony from Deputy Jason Barnard, Deputy Tress Diaz, Deputy Michael Richards, and Officer Pierce Wilbur.

On May 11, 2016, DASO deputies responded to a domestic disturbance at 2100 Isaacks Lane, Space 42, in Las Cruces, New Mexico. (Tr. of Nov. 2, 2017 Hr'g[2] at 18:13, 26:22, 40:24; Tr. of Nov. 30, 2017 Hr'g at 6:7–10; Doc. 24-1 at 1.) Defendant Izaiya Silva and his then-girlfriend, Syerra Benavidez, had been in an altercation at that location, which is the residence of Benavidez's mother, Judith Rodriguez. Rodriguez called the police because of the altercation. (Tr. of Nov. 2, 2017 Hr'g at 40:23–41:2; Doc. 24-1 at 1.) Through the investigation, DASO learned that Silva and Benavidez argued about cigarettes, and Silva began to choke Benavidez. (Doc. 24-2 at 2.)

---

[2] The Court's citations to the transcripts of the November 2 and November 30, 2017 hearings refer to the Court Reporter's original, unedited versions. Any finalized transcripts may contain slightly different page and/or line numbers.

When DASO deputies arrived, Benavidez was having a panic attack, and Silva reentered the residence to attempt to calm down Benavidez. (Tr. of Nov. 2, 2017 Hr'g at 19:11–20:8, 42:5–13; Doc. 24-2 at 2.) Deputy Barnard entered the residence to speak with Silva. (Tr. of Nov. 2, 2017 Hr'g at 20:5–12.) Silva, however, stepped away from Deputy Barnard, so Deputy Barnard attempted to place Silva in handcuffs to arrest him. (Tr. of Nov. 2, 2017 Hr'g at 20:19–25, 42:16–43:5.) But Silva resisted and pulled away. (Tr. of Nov. 2, 2017 Hr'g at 20:24–25, 43:5–7.) Deputy Barnard then placed Silva under arrest for the criminal offenses of battery of a household member and resisting and obstructing a law enforcement investigation. (Tr. of Nov. 2, 2017 Hr'g at 21:1–5, 43:21–24; Doc. 24-2 at 2.)

When DASO deputies arrested Silva, Silva's bags were laying in the front yard of Rodriguez's residence at 2100 Isaacks. (Tr. of Nov. 2, 2017 Hr'g at 32:3–10, 44:2–22, 53:17–25; Tr. of Nov. 30, 2017 Hr'g at 6:15–20; Doc. 24-1 at 1.) Rodriguez informed deputies that she didn't want Silva's bags at her residence. (Tr. of Nov. 2, 2017 Hr'g at 21:17–21, 44:18–22; Tr. of Nov. 30, 2017 Hr'g at 6:20–22; Doc. 24-1 at 1.) Rodriguez stated that she was on probation and believed that the bags possibly contained drugs or weapons. (Tr. of Nov. 2, 2017 Hr'g at 73:3–6; Tr. of Nov. 30, 2017 Hr'g at 6:23–25; Doc. 24-1 at 1.)

Because the deputies were going to take Silva to jail and because 2100 Isaacks was not Silva's residence, the deputies took the bags into custody for safekeeping. (Tr. of Nov. 2, 2017 Hr'g at 21:24–22:21, 26:23–25, 45:5–17, 47:13–14, 54:1–5; Tr. of Nov. 30, 2017 Hr'g at 7:4–7; Doc. 24-1 at 1; Doc. 24-2 at 2.) As part of their standard operating procedures, Deputies Barnard and Tress inventoried Silva's property for safekeeping. (Tr. of Nov. 2, 2017 Hr'g at 22:18–23:25, 46:1–49:4. 63:18–64:11; Tr. of Nov. 30, 2017 Hr'g at 7:7; Doc. 24-2 at 2.) During the inventory, DASO deputies discovered two firearms: (i) a Marlin, model 200 12-

gauge shotgun, bearing serial number KN107621, that had been sawed off at the barrel and stock; and (ii) a unknown manufacturer, unknown model, .22-caliber bolt action long rifle, bearing serial number 458114, that had also been sawed off at the barrel and the stock. (Tr. of Nov. 2, 2017 Hr'g at 24:1–26:14, 49:3–25, 64:22–67:1; Tr. of Nov. 30, 2017 Hr'g at 7:7–11; Doc. 24-3 at 1; Doc. 24-1 at 1.)

DASO Investigator Pierce Wilber interviewed Silva after his arrest. (Tr. of Nov. 30, 2017 Hr'g at 9:13–19; Doc. 24-1 at 1–2.) After introducing himself and providing Silva's identification information, Officer Wilber confirmed with Silva -- with which Silva acknowledged and agreed -- that he advised him of his *Miranda* rights and confirmed with Silva that Silva provides the statements voluntarily:

> Officer Wilber: *I had advised you of your Miranda rights since you were brought in here in handcuffs, and, if you want to talk that's fine. Uh . . . Obviously I haven't threatened you or promised you anything in order to have you talk to me, correct?*
> Silva: *Yes.*
> Officer Wilber: *OK. And if you do so, you're going to be doing so voluntarily and not you know, forcing you in any way, correct?*
> Silva: *Yes.*
> Officer Wilber: *Alright.*

(*See* May 11, 2016 Interview of Silva ("Interview") at 00:00–01:04; Tr. of Nov. 30, 2017 Hr'g at 10:8–12:24.) Silva told Investigator Wilber that, on the previous night, several individuals "jumped" Silva and Benavidez. (Doc. 24-1 at 1.) Silva then called his cousin to ask for "protection." (*Id*.) Silva's cousin provided Silva the sawed-off shotgun, which Silva had seen before, and also provided him the sawed-off rifle, which Silva had not seen before. (Doc. 24-1 at 2; *see also* Interview at 07:02–22.) Throughout the interview, there are times that Silva was reluctant to provide certain information and refused to do so, but he never asked for an attorney

or asserted his intention to remain silent. (*See generally* Interview; Tr. of Nov. 30, 2017 Hr'g at 13:1-23.)

No charges have been pursued by the State of New Mexico or the City of Las Cruces, New Mexico, against the Defendant. (Tr. of Nov. 30, 2017 Hr'g at 14:2–5.) The local authorities turned the firearm, which is the subject of this prosecution, over to federal authorities, resulting in the above referenced indictment being returned against Defendant. (Tr. of Nov. 30, 2017 Hr'g at 14:4–6.) Because of the nature of these short-barrel firearms, the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") began a federal investigation of Silva for a violation of the United States' laws prohibiting certain unregistered firearms pursuant to the National Firearms Act. Through the course of this investigation, ATF found that, in violation of federal law, neither of these firearms had been registered to Silva in the National Firearms Registration and Transfer Record ("NFRTR"). (*See* Doc. 3.) On August 16, 2017, Silva was indicted by a one-count indictment, which charges him with possessing an unregistered firearm, in violation of 26 U.S.C. §§ 5841(a), 5845(a)(2), 5861(d) and 5871. (Doc. 3.)

Of relevance to the credibility of testimony from certain witnesses, evidence in the record has established that Deputy Diaz is subject to ongoing criminal charges following a September 29, 2017 arrest, and Deputy Barnard had previously received a disciplinary reprimand in 2011, involving breach of duty and untruthfulness. (*See* Tr. of Nov. 2, 2017 Hr'g at 9:20–24, 10:4–10, 27:21–28:6, 79:1–6; Doc. 28 at 1–2.)

## IV. Discussion: Motion to Suppress Fruits of the Bag Searches

Defendant contends that evidence obtained from the search of his bag by DASO deputies should be suppressed as the fruits of an unlawful investigatory search without

probable cause.[3] The Government maintains that the evidence was discovered pursuant to a permissible inventory search and is thus admissible.

The Fourth Amendment protects citizens from "unreasonable searches and seizures" by government officials. U.S. Const. Amend. IV. It is a basic principle of Fourth Amendment law that "a warrant must generally be secured." *Kentucky v. King*, 563 U.S. 452, 459 (2011). However, the warrant requirement is subject to several reasonable exceptions. *Id.* (citing *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Inventory searches are one such well-defined exception to the warrant requirement of the Fourth Amendment inasmuch as inventory searches are routine noncriminal procedures, judged by the standard of reasonableness. *United States v. Kornegay*, 885 F.2d 713, 716 (10th Cir. 1989). Inventory searches are performed for three reasons: (i) the need to protect the owner's property while it remains in police custody; (ii) the need to protect the police against claims or disputes over lost, stolen, or vandalized property; and (iii) the need to protect the police from danger. *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976); *United States v. Reyes-Vencomo,* 866 F. Supp. 2d 1304, 1331 (D.N.M. 2012).

While searches for the purpose of producing an inventory constitute a legitimate exception to the warrant requirement, these searches may not be used as a pretext where the true purpose of the search is investigative rather than administrative in nature. *See United States v. Haro-Salcedo*, 107 F.3d 769, 772–73 (10th Cir. 1997) ( "[a]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence, but rather an

---

[3] Defendant also sought suppression under New Mexico state constitutional and statutory law. However, in the context of the exclusionary rule "the fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended." *United States v. Dickerson*, 195 F.3d 1183, 1187 (10th Cir. 1999).

administrative procedure designed to produce an inventory"). Accordingly, "inventory searches are reasonable only if conducted according to standardized procedures." *Id.* at 772. However, "[a] written policy concerning inventory searches is not necessary; an oral policy is sufficient to meet the standard procedure test that the Tenth Circuit articulated." *Reyes-Vencomo*, 866 F. Supp. 2d at 1331 (citing *United States v. Lugo*, 978 F.2d 631, 636 (10th Cir. 1992)).

The relevant search in this case involved the contents of Defendant's bag that was taken by police at the time of his arrest. While the inventory search exception is analyzed most commonly in the context of impounded vehicles, case law from both the Supreme Court and this Circuit has applied the doctrine to searches of a defendant's bag, finding that such searches do not violate the Fourth Amendment. *See*, *e.g.*, *Illinois v. Lafayette*, 462 U.S. 640 (1983) (upholding reasonableness of an inventory search of a shoulder bag in the possession of a defendant being taken into custody); *Kornegay*, 885 F.2d at 715–17 (upholding the constitutionality of an inventory search which included opening a bank bag and cataloguing its contents); *United States v. Jacquez*, 409 F. Supp. 2d 1286, 1296 (D.N.M. 2005), *aff'd*, 284 F. App'x 544 (10th Cir. 2008) (finding permissible the inventory search of a fanny pack). Accordingly, the Court may analyze the reasonableness of the search in light of the standards governing the legitimacy of an inventory search.

Defendant claims that the inventory of his items was mere pretext for an impermissible investigatory search designed to discover incriminating evidence. (Doc. 20 at 2.) In support of this assertion, defendant relies on the fact that, prior to the seizure of his items, Rodriguez purportedly told officers that Defendant was on probation and stated that his bag may have contained either drugs or guns. (*Id.* at 1.) The record admittedly contains contradicting testimonial evidence as to which officers were aware of Rodriguez's statements and when.

8

Detective Barnard testified that he did not recall Rodriguez telling him that the bags possibly contained drugs or guns. (Tr. of Nov. 2, 2017 Hr'g at 32:18–33:5.) Further, Deputies Diaz and Richards stated that Rodriguez had not informed them of any guns or drugs. (Tr. of Nov. 2, 2017 Hr'g at 52:23–54:15–18, 72:3–7.) However, Deputy Rodriguez testified that Deputy Diaz was aware of Rodriguez's statements regarding possible drugs or weapons in the bag and conveyed that information to him at a later time. (*See* Tr. of Nov. 2, 2017 Hr'g at 72:20-73:13). Further, Officer Wilbur stated at the hearing that the other deputies had verbally briefed him about Rodriguez's statement and that she had confirmed her belief that the bag contained guns or drugs in her interview, albeit after the search had already occurred. (*See* Tr. of Nov. 30, 2017 Hr'g at 6:15–7:1, 14:20–15:3.)

Regardless whether the officers were aware of the possibility of drugs or guns contained in the bags when they took possession of them, the circumstances of this case, in totality, support a finding of reasonableness. Defendant was placed under arrest for battery and obstruction at a home that was not his. (*See* Tr. of Nov. 2, 2017 Hr'g at 21:1–5, 40:23–41:2, 43:21–24; Doc. 24-1 at 1; Doc. 24-2 at 2.) Rodriguez, the homeowner, refused to take possession of Defendant's personal effects, and police collected the items so as not to expose them to theft or damage. (*See* Tr. of Nov. 2, 2017 Hr'g at 21:17–22:21, 44:2–45:17, 47:13–14, 54:1-5; Tr. of Nov. 30, 2017 Hr'g at 6:15–7:7; Doc. 24-1 at 1; Doc. 24-2 at 2.) In such circumstances, police are justified in taking possession of a bag in order to prevent theft or damage and are entitled to perform an inventory search of property seized. *See Kornegay*, 885 F.2d at 716. Further, Officer Wilbur clarified that Rodriguez was not certain of the contents of Silva's bag and explained that police had no reason to believe possession of a weapon constituted evidence of a crime, as Silva was lawfully permitted to possess an unmodified

firearm at the time of his arrest. (*See* Tr. of Nov. 30, 2017 Hr'g at 23:22–25:9.) In such situations, case law has established that the presence of an unmodified firearm, while not unlawful, nonetheless justifies an inventory search as a potential danger to police. *See Opperman*, 428 U.S. at 369. Given the legitimate case for safeguarding property left in public and avoiding the potential danger of an unattended firearm, the mere comment by Rodriguez regarding the possibility of contraband or guns does not warrant a finding of bad faith by police.

In addition, the evidence presented indicates that police followed standardized procedures, as established by verbal instructions and common practice/field training of the sheriff's department, when conducting the search of Defendant's property. (*See* Tr. of Nov. 2, 2017 Hr'g at 22:18–23:18, 34:3–35:8, 36:23–25, 47:5–21.) Police collected and searched all of Defendant's discarded property, rather than just the bag that Rodriguez indicated might have drugs or guns, in order to establish a complete inventory of his possessions. (Tr. of Nov. 2, 2017 Hr'g at 23:20–26:25, 45:9–14, 46:16–50:10; 54:8–14, 67:2–14.) This action supports the conclusion that the search was administrative rather than investigative in nature. Thus, because the property was taken for a legitimate reason and subjected to the same standardized treatment, the inventory justification was not a ruse for an unlawful search or for the purpose of discovering incriminating evidence.

Finally, the Court must address the issue of credibility. At the November 2, 2017 hearing, Defendant brought to light that two of the Officers involved in the search of Defendant's property have past transgressions relevant to the credibility of their testimony. Specifically, the Government has provided Defendant with information that Deputy Tress Diaz is subject to ongoing criminal charges following a September 29, 2017 arrest, and Deputy Jason

Barnard had previously received a disciplinary reprimand in 2011 involving breach of duty and untruthfulness. (*See* Doc. 28 at 1–2.) The parties confirmed during the hearing that these facts are not disputed. (*See* Tr. of Nov. 2, 2017 Hr'g at 9:20–24, 10:4–10, 27:21–28:6, 79:1–6.) However, the Supreme Court has instructed that, when determining the reasonableness of a search, an objective standard is applied regardless of the subjective intentions of individual officers. *Whren v. United States*, 517 U.S. 806, 814 (1996). This standard has been applied specifically to analyses of inventory searches. *See*, *e.g.*, *United States v. Hawkins,* 279 F.3d 83, 86 (1st Cir. 2002) (rejecting the challenge to a search where the defendant alleged the inventory was a "ruse" to search for drugs because "[t]he subjective intent of the officers is not relevant so long as they conduct a search according to a standardized inventory policy"); *United States v. Jeffreys*, 111 F. Supp. 3d 70, 77 (D. Mass. 2015) ("Even if the officers had a subjective intent to conduct an investigatory search, such intent does not convert a permissible inventory search in accordance with a standardized policy into an impermissible, warrantless search"). Thus, whether or not the Officers' testimony regarding their purpose for undertaking the search of Defendant's property is credible, the fact that DASO possessed a legitimate justification for performing an inventory search combined with the Officers' use of standardized procedures means that the search did not violate constitutional requirements and its fruits are thus admissible.

## V.     Discussion: Motion to Suppress Recorded Interview Statements

Defendant seeks to exclude the recording of his post-arrest interview statements made to then-DASO Detective Wilber on the basis that DASO officers violated his right to counsel under *Miranda v. Arizona*, 384 U.S. 436 (1966). (*See* Docs. 20 at 2–3; 33.) The Government responds that Defendant's confession remains admissible because Defendant was advised of his

*Miranda* rights, agreed to voluntarily waive those rights, and at no time revoked that waiver or requested access to counsel. (Doc. 40 at 1–3.)

In order for a defendant's statements made during a custodial interrogation to be admissible at trial, the government must show that Defendant was properly advised of his *Miranda* rights, that he understood those rights, and that he knowingly and voluntarily waived those rights. *See Berghuis v. Thompkins*, 560 U.S. 370, 388–89 (2010); *United States v. Garcia*, Cr. No. 10-1122 RB, Doc. 33 at 14 (D.N.M. July 6, 2010). A waiver of these rights need not be explicit, but can be implied where it is shown that the accused has been given a *Miranda* warning, understood the warning, and nonetheless continued to provide un-coerced statements to police. *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010); *North Carolina v. Butler*, 441 U.S. 369, 376 (1979). Further, once an implied waiver has been obtained, the accused must unambiguously invoke his right to consult with counsel or to remain silent in order to revoke such waiver and stop further police questioning. *Thompkins*, 560 U.S. at 382; *Garcia*, Cr. No. 10-1122 RB, Doc. 33 at 14.

The post-arrest interview conducted by Officer Wilbur was recorded by DASO. This recording establishes that Defendant admitted that he knew his black backpack contained two firearms for protection and that he had previously seen the illegal sawed-off shotgun that he possessed on May 11, 2016. (*See* Interview at 03:59–04:40, 07:02–22.) Thus, the relevant inquiry is whether Officer Wilber apprised Defendant of his *Miranda* rights before Defendant made the incriminating statements and whether he revoked that waiver at any point by expressly requesting counsel.

Applying this inquiry to the present case, evidence cited by the Government strongly supports a finding that Defendant's Miranda rights were not violated. Testimony by Officer

Wilbur states that: 1) he read Silva his Miranda rights from a card provided by the department, and 2) Silva acknowledged that he understood these rights and was voluntarily speaking with Officer Wilbur. (Tr. of Nov. 30, 2017 Hr'g at 9:13–12:24; Doc. 24-1 at 1–2.) Further, the recording itself demonstrates that Silva acknowledges that Officer Wilbur advised him of his *Miranda* rights and confirmed with Silva that Silva provided the statements voluntarily. (Interview at 00:00–01:04; Tr. of Nov. 30, 2017 Hr'g at 11:19–12:21.) This testimony and the recording verify that Defendant understood and implicitly waived his Fifth Amendment *Miranda* rights. Finally, Officer Wilbur testified that Silva at no time revoked this implicit waiver by requesting access to counsel or invoking his right to remain silent. (Tr. of Nov. 30, 2017 Hr'g at 13:1–23.)

By contrast, Defendant did not provide any evidence to rebut the Government's proffered facts. While Defendant's counsel implied during cross-examination that Defendant possibly revoked his waiver by requesting counsel during an unrecorded portion of the interview, this assertion is not supported by any testimony or affidavit evidence in the record. (*See*, *e.g.*, Tr. of Nov. 30, 2017 Hr'g at 16:7–9, 21:14–15.) Further, when directly confronted with these unsupported allegations during cross-examination, Officer Wilbur denied them and testified under oath that Silva never invoked his right to remain silent and never revoked his Miranda waiver by requesting access to an attorney. (Tr. of Nov. 30, 2017 Hr'g at 13:1–23, 16:7–10, 17:10–16.)

Officer Wilbur did admit that he did not provide Silva with a written form and that he deviated from best practices by not recording the actual reading of the Miranda rights. (*See* Tr. of Nov. 30, 2017 Hr'g at 18:1–21:13.) However, the Supreme Court has made clear that minimum constitutional standards are met so long as an individual is read and understands his

Miranda rights. *Berghuis*, 560 U.S. at 388–89 ("a suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police"). The Fifth Amendment does not require a person to sign a written waiver nor does it require that the reading of *Miranda* rights be recorded. *United States v. Granados*, 846 F. Supp. 921, 926 (D. Kan. 1994) (holding that failure of police to offer a written form does not undo a waiver of *Miranda* rights); *United States v. Yunis*, 859 F.2d 953, 961 (D.C. Cir. 1988) (holding that law enforcement's failure to use recording equipment available to them does not undermine the validity of a *Miranda* waiver). As indicated above, both Officer Wilbur's testimony and Defendant's recorded acknowledgement establish that Defendant was read and voluntarily waived his *Miranda* rights. (Tr. of Nov. 30, 2017 Hr'g at 9:13–12:24; Doc. 24-1 at 1–2; Interview at 00:00–01:04.) The Fifth Amendment is thus satisfied and Defendant's subsequent incriminating statements are admissible.

Finally, Defendant's legal analysis on the issue of access to counsel contained in his original and supplemental motions to suppress seems to conflate the Fifth Amendment *Miranda* right to counsel with the distinct Sixth Amendment right to counsel. *See Montejo v. Louisiana*, 556 U.S. 778, 805 (2009) (discussing distinction between Fifth and Sixth Amendment right to counsel). Initially believing that the recorded confession had been obtained during an April 26, 2017 discussion with ATF Agents during a self-surrender for the purpose of collecting DNA evidence, Defendant claimed that he could not be interviewed without his counsel present. (Doc. 20 at 2–3.) It is true that the Sixth Amendment right to counsel prohibits law enforcement from interviewing a defendant in the absence of retained counsel, even where Defendant has not specifically requested access to counsel. *Patterson v. Illinois*, 487 U.S. 285, 290 (1988). However, this right attaches only to interviews conducted after formal criminal judicial

proceedings have been initiated. *Rothgery v. Gillespie Cty.*, 554 U.S. 191, 198 (2008). Here, the recorded confession was obtained during a post-arrest interview on May 11, 2016, long prior to Defendant being charged or retaining counsel. (*See* Docs. 3) (criminal proceedings initiated on August 16, 2017); 20 at 3) (counsel retained on April 26, 2017).) As such, the Sixth Amendment right to counsel is not applicable and the Fifth Amendment *Miranda* right to counsel must be specifically invoked.

## VI. Conclusion

For the foregoing reasons, the Court finds that: 1) regardless of the individual officers' subjective intent or credibility, DASO deputies had a legitimate interest in safeguarding Defendant's property following his arrest and followed standardized inventory procedures for all of the property seized; and 2) the evidence established that Defendant received his *Miranda* Warnings, implicitly waived his Fifth Amendment right by providing un-coerced statements thereafter, and did not revoke this waiver by requesting counsel at any point.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion to Suppress (Doc. 20) and Supplemental Motion to Suppress (Doc. 33) are **DENIED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**